Good morning. Arthur Kratz on behalf of Genesis Energy. When this court granted en banc review in the Duaron case, it did so explicitly in order to simplify the test for classifying a contract with Maritime and to remove district courts from what this court described actually in the Crescent Energy case as a precedent-laden trudge through the very specific facts of each individual case to determine whether a contract was sufficiently salty or not. Salty? And that's not my language, Your Honor. That's actually this court's language. Oh, is that what we say? Yeah. We say all kinds of funny things in Maritime. This court has ridiculed the pre-Duaron test as being a search for saltiness in a contract. And so that's not, I can't take credit for that cleverness. And that was the situation pre-Duaron. And so when this court granted en banc review in Duaron, it did so in order to leave that behind and move into a system where contracts were predictable and the parties of the courts could easily ascertain whether a contract was Maritime or not. Did the contract call for substantial work to be performed from a vessel? That's the question today. Your Honor, I think the question is whether the contract called for substantial use of a vessel and performance of the contract. Well, I'm quoting Duaron that says the focus should be on whether the contract calls for substantial work to be performed from a vessel. It does say that. It also says in another place whether the contract called for the substantial use of a vessel and the performance of a contract. It says that we should review evidence of how a vessel was used only if contract and expectation evidence are unclear. Are you saying that contract and expectation evidence are unclear here? No, Your Honor. In fact, that's my first point. My first point is that the expectations of the parties could not be more clear. And the reason for that is because the district court had in front of it declarations from the principal Genesis employee who negotiated the contract and the principal Danos employee who negotiated the contract. Those are the Bourgeois and the Douglas declarations. And in those two declarations, which there's zero daylight between the two of them, the Genesis employee and the Danos employee explained to the court what it was that they anticipated at the time of contracting the vessel would contribute to the performance of the contract. And I think what took place in the district court, and frankly it's happened on Appeal as well, Danos has tried to remove the focus away from those declarations and talk about other evidence in the record. Your Honor, I would submit that the court's evidence, that the court's analysis should start with the plain language of the contract. And if the contract is less than clear, then we look to the party's expectations at the time of contracting. Well, tell us about how the plain language of the contract supports your client. So the plain language of the contract does not explicitly provide how a vessel is going to be used. And that's not incredibly uncommon, Your Honor, and that was the case in Dwaron, it was the case in Crescent Energy, it was the case in Verriest. Because the written contract between the parties here is a master service agreement, which provides for basically the framework for the parties to engage in ongoing business. And so that particular... So are you saying the scope of the contract is unclear? Well, no, Your Honor, and I'll tell you the reasons and why, because there's two elements to the contract here. There's the MSA, the master service agreement, which sets forth an overarching relationship between the parties, and then there's the oral work order. Okay, I'm not clear on what you're saying, because I'm asking you questions directly from Dwaron, I'm asking verbatim questions from Dwaron to figure out what is the analytical place we are. Yes, Your Honor. And, I mean, we start with the text. Correct. If the contract's written. Yes. And I thought you were going to say, and you were telling us that you start with the text, and I thought you were going to say the text says we win. No, and then you said, no, it's not. And then I said, is it ambiguous? And so, if it's unclear, then you go to the next step, which is the extent to which the parties expect vessels to be involved in the work. And that can also be unclear. And then you go to evidence of the work actually performed, and the extent of vessel involvement in the work. So, you need to get us, what is the path? So, I completely agree with what Your Honor just articulated. I think that is the path. Let me start with what the contract is. So, there's two elements to the contract here. There's the master service agreement itself, and then there's the oral work order that governed this work. Now, obviously we can't look to the text of an oral work order, right? So, what we do instead is we look to the declarations of the two individuals who negotiated that oral work order, and that is Mr. Douglas and Mr. Bourgeois. And so, and I apologize if I got caught up in Your Honor's question about the text of the contract, but that was the reason for that, is because the oral work order, there's obviously not a text for us to interpret in that respect. But what we do is we look to the oral contract and the two declarations of the parties. And what they anticipated at the time of contracting, which is undisputed, is that we were dealing with an atypical platform repair contract, because the platform had been damaged in a way that made it inoperable and uninhabitable. And so, what they needed to do was not, in a typical contract, you have an offshore service vessel, picks up crew and equipment, takes it to a platform, drops them off, comes back and gets them when they're done. Not what happened here. Not what the parties anticipated. What the parties anticipated is that they were going to need a vessel that was capable of housing the work crew for the entire duration of the project. They anticipated that that vessel, in addition to providing transportation services, but once we start the analysis, once the vessel actually arrives at the job site, once the vessel arrived at the job site, what it would need to do is it would need to provide housing for the crew. It would need to provide meals for the workers on the platform. It would need to provide a space for storage and equipment. It would need to provide potable water, which the platform could not provide. It would need to provide fuel for the work to power generators and things like that. It would also need to provide an office space, a meeting space, for the crew to engage in their daily safety meetings and sign their daily safety paperwork before commencing work on the platform. The vessel would facilitate the transport, the movement of the workers from the vessel, where of course they slept and ate, to the platform to do their work and back. The vessel would store and provide the work lights. Some of the work that was done on the platform was done on a night shift and so the vessel had to provide lighting for that. That was what the parties anticipated at the time of contracting and we know that because that's what the Bourgeois and the Douglas declarations tell us. So then the next question, Chief Judge Elrod, that the court has to answer is, well, is that, is the vessel's role in the performance of the contract substantial or not? And obviously Mr. Douglas and Mr. Bourgeois thought so at the time of contracting because they explicitly said as much in their declarations. Tell me about that. I mean, I'm assuming maybe the other side will disagree that we can look to those declarations at the step of the analysis where we look at the contract. So tell me what in the declarations, I know you're discussing in brief, but what in the declarations nudges the needle towards substantial use of the vessel? In the declarations, both Mr. Bourgeois and Mr. Douglas specifically delineate the role that they expected a vessel to play in the performance of this contract. And they don't just say, we thought it would be- Is it the things you just enumerated? It's the exact same things I just listed. Some of that sounds, I mean, some of it sounds incidental under our cases, but what would you point to in that list of things that really makes this case, I mean, you know, I know we did Dwyron to get away from the president before, but we have to look at the president since Dwyron. What in that enumerated list really in your view moves the needle the most? I think it is the fact that the vessel had to remain on-site for the entire performance of the contract. Remain on-site. Is that why they said this was an atypical? Correct. That the vessel had to remain there. So when Danos gave its corporate deposition in the case, they put up a different representative, but Danos' corporate representative admitted that this was, I think his exact language was an exception type contract. And so what makes this different from cases where a vessel doesn't play a substantial role is the fact that the vessel itself, not only was it indispensable, and that's not dispositive, but the vessel was indispensable to the performance of the work. It had to physically remain at the platform for the entire duration of the project. Otherwise the work couldn't have been done. It couldn't have been done at all, but for the presence of the vessel. Correct. So it was necessary. It was necessary, indispensable. I mean, there are a lot of different words you could use for it, but absolutely. I guess we do a necessary as a term sometimes in this context. Yeah, absolutely. And did it also assist in the repairs themselves, dealing with fuel and water being pumped? So the vessel provided potable water to the platform. It provided fuel to power generators on board the platform. It provided essentially a storage space for tools and equipment, which were transferred back and forth to the platform as necessary in order to perform the work. I don't want to repeat myself, but I've already said all the other things that the vessel provided. And so Dwaron itself, all of Danos' arguments in this case rely on that footnote from Dwaron, where this court said, if you have a contract that calls for part of the work to be done on the vessel and part to be done on land, or in this case a platform, you need to look at the relative contribution of the vessel to the performance of the work in terms of the vessel's importance and value. Do you think this case is like Centaur and Crescent, Ben? I think it certainly has many similarities to Centaur and Crescent. I mean, I don't want to get them confused, but I think in the Crescent Energy case, the vessel provided housing services for the crew. And Danos seizes on one word that this court used when it said the vessel provided other incidental uses, such as housing, and they say, okay, the court has held that the provision of housing is incidental. I think that reads an awful lot into the court's reference in that case. I think what the court said is there were a lot of things the vessel did. I mean, if we, you know, I have Crescent Energy right here. I mean, this court said, you know, very, very clearly that— It couldn't have done this without the fuel, could it have? It couldn't have done it without the fuel, couldn't have done it without the potable water. They couldn't have done the work if the vessel didn't provide a housing space for the crew, right? The crew has to have a place to sleep and eat, or they can't work on the platform. Yeah, but all those things are true of transportation, right? Getting the crew out there. So I think that's a good point, Your Honor. So in the Fifth Circuit's, in the Ombud Court's footnote in Dwarhan, what the court said is when you have a mixed contract that provides for some work to be done on land and some to be done on a vessel, then you have to look at the relative importance and value of the vessel contribution to the work. And then at the very end of that footnote, it says that analysis, the relative value and importance, would not include transportation to and from the job site. And so I think Danos' arguments where they say, OK, well, providing potable water, that looks like it's incidental to transportation. Providing fuel, that looks like it's incidental to transportation. Well, they're missing the last few words from this court's footnote, which is transportation to and from the work site. This vessel absolutely transported people out to the platform, and it transported people back. But the court will notice in our briefing here and in our briefing below, we have never spent any time arguing about what the vessel did during the transport to and from. And that's because this court instructed us in Dwarhan, and we're not supposed to look at that. And so what Danos is asking this court to do is to expand the Dwarhan footnote, essentially to create a massive exception to the rule of merit, to the rule of classification of maritime contracts, to say that when you look at the relative importance and value of the vessel's work, you have to go through line by line and exclude anything that feels like transportation. Well, that's not too terribly different from the analysis that the Dwarhan court ridiculed, where we're trying to decide if the services are sufficiently salty. Well, now what Danos says is, OK, you don't have to decide how salty they are. You just have to decide how close they are to transportation. That is the precise type of analysis that this court repudiated in Dwarhan. And the last point, just to back up a little bit, so you're saying the contract was unusual because the vessel had to remain alongside. That was because the platform had been damaged. How would you characterize the general nature of the work that was being done to the platform? There were repairs to the... It was basically the first step in repairing the platform to get it back into service. So because it was uninhabitable and inoperable after the hurricane, there were some initial, what I would categorize as sort of safety type repairs that had to be done before the platform could be reoccupied and the rest of the repairs undertaken, eventually to get it back online. The other point I was going to make, Dwarhan instructs us to consider the relative importance and value of the vessel's contribution to the project. We make this point in our reply brief. If you look at what Genesis paid Danos for the entire project, Genesis paid Danos $36,000 to do this work. If you look at what Genesis paid, not for the entire charter of the vessel, but just for the period of time that the vessel was physically present at the platform, that was $48,000. So if we're talking about the relative value of the vessel's role as related to Danos, Genesis paid more. And again, in this price that I'm... And we outlined this in the reply brief, I'm stripping out transportation to and from the work site. Genesis paid $48,000 for this vessel to remain outside the platform during the work. They only paid $36,000 to Danos for all of the work that Danos did. And so if we're following the Umbach court's instruction in Dwarhan to look at the relative value of the vessel work in relation to the other work, well, it's more than 50%, although the Dwarhan footnote tells us that 30% ought be enough. And so I think that when you engage in the holistic analysis that Dwarhan instructs us ought to be engaged in, then the answer is that this is a maritime contract. And we request on that basis that the court reverse. Thank you. Good morning, and may it please the court. The heart of Danos's argument is that the contract documents between Danos and Genesis did not provide, and the expectation of the parties at the time performing the contract did not include the substantial use of a vessel. Importantly, there's two separate contracts to think about. There is the Danos-Genesis contract, which entirely related to repair work on the platform to make it accessible for additional work. There's also Genesis' contract with Boatrook. Genesis contracted with Boatrook to transport materials, tools, and personnel to the platform, and then to remain as crew quarters. Danos was not a party to Boatrook and Genesis' agreement. Danos's understanding of that contract at the time it contracted with Genesis was the vessel would provide transportation and crew quarters. But again, going back- Would there be an additional work platform? Your Honor, there is no evidence that there was a work platform on the vessel. It's in the declaration that the vessel was an additional work platform. Your Honor, there's a conclusory statement that the vessel served as a work platform. The statement that it served as a work platform- Non-potable to pump water and diesel fuel. Your Honor, the vessel carried cargo of water and fuel that was transferred to the platform where Danos used the fuel and water to enable its work on the platform. The fuel and water is essentially cargo on the vessel being transported like it would be to any other project. But spatially- Excuse me. Fundamentally and conceptually, Danos was exclusively doing work on the platform. Duaron teaches that we should look to the contract and the expectations. The counsel already discussed the MSA, which is completely silent as to the role of the vessel or any maritime activity. The other document that wasn't discussed is the job plan. If there were evidence in the record that the vessel is an additional work platform and that the work was the pumping and the transferring of the fuel and powering the crane and the welding machines, would that change the analysis if there was such evidence in the record? Possibly, but the evidence in this case is that the Boatrick crew pumped fuel onto the platform. Danos crew did not pump fuel. Secondly, the machinery that required diesel was all used on the platform. So the diesel, the cargo, was transferred to the platform where it was used by equipment by Danos. The vessel didn't provide direct power to enable Danos to run its equipment besides its cargo of diesel fuel. Your Honor, going back to the job plan, this is a document that was prepared jointly by Danos and Genesis. It includes two relevant sections, the scope of work objective, which provides that Danos will make the platform safe for riser de-oil operations and drain the chops, pig launcher, and receiver. The scope and objective includes five items of work on the platform. There is no reference to a vessel or any traditional maritime activity in the scope of work and objective. Again, this is jointly drafted by Genesis and Danos. More importantly, there's a detailed procedure. There's 11 items in that detailed procedure, which include 27 subparts. This is an extremely detailed description of the work that was to be prepared. Again, jointly prepared by both Genesis and Danos. There is one reference to a vessel. That is that the crew will live on the vessel and transfer daily to the platform to complete their work. Isn't that unusual? The boat trip may testify that that is not unusual. There's other evidence in the record that says it is unusual. Whether or not it's unusual, though, is not the test in the Dwaron. The test is whether it's substantial role of the vessel. I'm sure, yeah, but I think the argument would be, and I'm not saying I agree with this, but the argument would be because of the unusual, atypical nature of this contract, the vessel had to remain on one side. Therefore, there was a substantial involvement of the vessel in the work. I think that's the argument. Our response to that is that whether or not the vessel is continuously there is not the Dwaron test. The Dwaron test envisions a substantial role of the vessel. I know, but we're applying the... Look, it's just the nature of these tests. Substantial work. It sounds great, and then you have to apply it to facts, and it gets messy. We're just trying to understand how these facts cash out. I'll be honest with you. The one thing that perked my ears up was, it's atypical insofar as the vessel has to remain alongside. Is that because the platform is damaged? The other side said it's because the platform is damaged, and so therefore, the vessel had to remain there. The only use of the vessel during that period was for cargo operations and housing the crew. The vessel did not remain alongside to use a crane, to use a crane like we see in Crescent, to use a wire line like we see in Crescent, or a concrete mixture and crane like we see in Barrios. That is where the vessel was physically involved, had a role in the work being done on the platform. I guess in the typical case, let's assume it's the typical case is a vessel transfers the crew out to the platform, leaves. The crew is being transferred from the vessel to the platform in a basket, say. I don't know how they usually transfer, but let's say it's a basket. There's a problem with the basket. Somebody's injured. In that case, I see, okay, the use of the vessel there was incidental because it was purely for transport, so not a maritime contract, right? I think what the other side is saying is they've got an unusual contract here because the vessel has to remain alongside, and so it's more involved in the work. Yeah, Your Honor, I would just direct you to look, and I'll get to this, the actual use of the vessel. Okay, that's fine. Because the actual use of the vessel instructs the court in this determination. We have 101 hours of weather patterns and drifting. That's what the vessel was doing while it was continuously serving as a work platform. During that period, there's no involvement by the vessel in the work that Danos is doing on the platform. Going back to the job plan, because I think the discussion begins and ends with the job plan. Okay, yeah, you think we don't get to that. Well, I think the job plan is a document that's jointly prepared. Take a look at the detailed procedure. We have 27 subparts detailing use of the platform's frame, detailing specific tasks. In that whole period, a shared understanding in that document, there's but one reference to a vessel that the crew would sleep aboard. So just because they want to call it a work platform now, at the time the contract was formed, there's no reference to work being done on the vessel. Under earnest, mere reference to a vessel is not sufficient. We need actual substantial role in the work. Anticipated use of crew quarters has been described in Crescent and Quiros, which is an unreported case in district court. But in both cases was described as incidental. Danos is not saying that it's irrelevant. We think the transportation's relevant. It's not irrelevant, it's incidental to it. So without something else, without some other role of the vessel, incidental alone doesn't carry a substantial role. So the contract documents collectively do not set forth a substantial role. Genesis wants to look at these affidavits, which I will get to. Well, I was about to ask you that, because they seem like they pivoted very quickly to the Douglas and Bourgeois declarations, right? What's your view? Should we not look at those? Are they not relevant? Well, what's your view on that? I think they are relevant and the court can look at them. They were submitted with a motion for summary judgment. They were prepared well after the fact, after litigation had commenced. The documents that best exemplify the shared understanding of these parties are the contract and the job plan. And moreover, the district court considered the affidavits, right? District court looked at them, considered them, and found them to be conclusory and lacked actual substantive description of what role the vessel had. Going back to it, just because they call it a work platform, it raises a good question, what work was done? Now the transportation function, I know this was already discussed, but based on the reasoning in question, transportation is not included in the court's analysis of substantial role. While OCSLA mandates application of state law as a surrogate to federal law on fixed platforms, operations on the OCS invariably require the use of vessels to transport equipment, materials, and personnel to support operations on those fixed platforms. Excluding transportation from the analysis of a vessel role makes sense. In reasoning that transportation is irrelevant, this court created an important guardrail against the overexpansion of maritime jurisdiction in offshore service contracts. And that's in order to preserve the application of state law on platforms, which the Supreme Court has recognized should be treated like islands of the adjoining state. So if we were to suggest that because transportation now makes the whole contract colored maritime, it erodes the application of what should be state law. Danis' corporate rep testified that his understanding was that the vessel would provide initial transportation, mobilization, and then living quarters. When asked about functions beyond transportation, storage prior to transfer, and living quarters, he said, not to my knowledge. Implicit in transportation is also offloading and loading the cargo. If we were to suggest that offloading of the cargo is somehow a substantial role or not part of the actual transportation, we'd erode the notion that transportation is excluded. In Ray Offshore services recognize that loading and offloading should not be considered and excluded under the law as part of the transportation aspect. Where is it in the District Court's opinion that the District Court excludes the portions of the declarations? I don't have it in front of me, Your Honor. Because I have it in front of me. He did not exclude it. He considered it and found it not persuasive. But he didn't say, I'm striking it because it's conclusory or that I'm, that he's sustaining an objection to it. He's just saying it doesn't persuade him. That's a very different thing. Your Honor, you're correct. He did not strike it. So if he considered that, so the question is if we're allowed to consider it and he'd consider it and it could create a fact issue and it's not been excluded as conclusory, then we have a fact issue on our hands. So that's the problem here. I understand your point. So how? The consideration by the court was similar to the issues of the contract and the job plan. It's all been considered by the court. No, but the District Court doesn't get to just say, this ties it up at the bow the best way and so this is how I synthesize all the evidence. If there's a fact issue, there's a fact issue, even if you, the fact finder, would determine the evidence a certain way. The District Court looked at the job plan, the MSA, and the affidavits and said that it did not establish a substantial use. Right. It says that it was used as a work platform and that's the biggest problem in the case is that the declaration says it was used as a work platform and that it was anticipated to be used as a work platform. So if it was, then that would create a fact issue. Duaron permits the District Court where there's an uncertainty to look at the actual use of the vessel in the contract. That's what the District Court did here. He looked at the MSA, the job plan, and the affidavits, came to the conclusion that it was not actually established whether there was a substantial role for the vessel in this contract and looked at the actual use. Respectfully, the word substantial in the affidavits is not for any fact finder to state to this Court. It's for this Court to determine whether it is substantial. So we would submit that just because they said it's substantial does not mean that it's substantial. I'm not relying on the word substantial. We're talking about the function and whether it was used as a work platform, whether it was anticipated that it would be used as a work platform and that's why one of the reasons it would be there and whether there's any evidence that it was actually or that it was never. Your question raises the question of what work was done. It's not a magic word. Just because they say it's a work platform does not mean it is. We look at the actual. That's what we're trying to figure out. If work is being done with regard to the fueling and the potable water and is it like in the situation where we have the cranes and are they putting the stuff, the ancillary supplies for the crane usage? Respectfully, it is nothing like Crescent, Berrios, Quiros, even Duaron. There was no assembly or fabrication on the vessel. The pumping was done by the voucher crew again as cargo. There's no work that Danos did on the vessel. Despite calling it a work platform, there is no work. I think if I'm following what the district court says here on page 8 of its opinion, there may be other parts of it, because we're talking about declarations from the project managers of Danos and Genesis. Is that what we're focused on here? We called it the Bourgeois and Douglas declarations. Those are the two declarations, correct? Those are the declarations. At page 8 where the district court says the true, the Danos project manager, is that Douglas or Bourgeois? Douglas is Genesis, Bourgeois is Danos. Bourgeois did testify that both Danos and Genesis contemplated the substantial use of the vessel at the time of contracting for the repair work, but the district court says this statement doesn't itself provide evidence of the actual role anticipated by the parties for the vessel and that is the point under consideration. Is that where the district court sort of tries to resolve this issue? Yes, there's that statement, but that doesn't actually provide any evidence. Correct, Your Honor, and under Dwaron, we can look where it's unclear, which here we just have a conclusory statement of substantial or a conclusory statement of work platform. When you say conclusory, what I hear is this is on summary judgment and that's not sufficient to create a dispute of material fact. Correct, Your Honor. Have I addressed the affidavits sufficiently or would you like me to discuss any more claims in regard to the affidavits? Totally up to you. Thank you, Your Honor. We'll just keep asking questions if we have further questions. Thank you, Your Honor. We're good at that. Just as important to what the vessel did do is what the vessel didn't do. This case is readily distinguishable from the case law following Dwaron where it was found that the contract was maritime. The placement of a crane on the deck of a barge, the concrete mixer and crane in Barrios, excuse me, a crane in Quiros, these are very large pieces of machinery that are directly involved in the work. So those are sitting on a vessel? Correct. Are those next to platforms? I don't recall. Right, there's definitely no crane on the vessel. So that's different. Well, I'm just saying that the case law is readily distinguishable of what a stanchial use has been found to be. This would be a departure from what the case law has demonstrated to be a stanchial use. But it's supporting the crane is the argument. The crane aboard the platform was not running on the diesel fuel that Jenna's crew supplied. The diesel fuel that was provided was for light plants and welding machines. The crane operated on its own. So the platform on a crane that enabled transfer of equipment was not based on any cargo carried by the boat or vessel. Let me ask you about that. You mentioned the fuel earlier in your comments and I want to make sure that we're on the same page or I should say you and your opponent are on the same page about the fuel and the use of the word pumping. During the day while the job is being performed, is there fuel being pumped from the vessel onto the platform for use to be consumed by the Danos workers or is it fuel that is already in containers and the containers are picked up somehow or transported and placed on the platform and then are used by the workers as needed during the course of the work day? The fuel was pumped from tanks aboard the vessel onto the platform. The pumping occurred using, excuse me, the boat crew operated those pumps to transfer fuel and to be clear the cargo operations and pumping occurred during discrete segments of time during the vessel's presence near the platform. So it was not a continuous supply of fuel. It was not a continuous link to the platform. There's two more points I'd like to, three more points I'd like to touch on with my remaining time and that goes back to the analysis of actual work. Genesis faults Danos and the district court for looking at the actual work performed. Dworon permits this examination particularly in the manner the district court did which was following the examination of the contract and the expectations. And Ernest does not disclose reality that you may look to the actual work. Ernest noted that in a case like Dworon a fact investigation may be appropriate and we submit that this is exactly the kind of situation that merits the examination of the actual work. Relative importance, Dworon instructs that when work is performed in part on the vessel and in part on a platform we should consider not only the time spent on the vessel but also the relative importance and value of vessel based work. In this instance 100% of Danos' work is on the platform. Danos was contracted to do work on the platform. The relative importance is the platform work. Mr. Pratt's made a point I think it's in his reply brief about the relative amount of money paid excluding the transportation parts of the voyage of the vessel, you know 48,000 versus whatever. Do you have a response to that or do you want to try to characterize that? I think it's not as simple to boil it down to a monetary way of the two values. Danos was hired to do very specific work. When Genesis approached Danos to do work it asked for workers to go on a platform, repair hurricane damage and make it ready for further work. That is the point of the contract. That's why we're here. That's why Danos was involved was to do work on the platform. Now whether the vessel has another contract that is not part of Danos and Genesis' contract. I'm out of time so I appreciate the courts. Thank you. I have three points I want to try to make on rebuttal. The first relates to the declarations. I would strongly encourage the court to look at the declarations because they're in the record. I brought Mr. Douglas' declaration to the I think is belied by the text of the declaration. In substance it's five pages long and what happens is on the third page there's a statement that the parties anticipated that it would require the continuous use of the vessel to perform the work. And then what follows from that is one, two, three, four, five, six, seven paragraphs that span almost the entirety of the following page delineating the very specific things the parties thought the vessel would do. In fairness to Danos, I just don't think it's accurate or fair to describe the declarations as conclusory but the court doesn't have to take my word on that. The court can look at the declarations and I think it will come to the same conclusion. Well we have them. We have them here. And that's just my point is that I don't so I'll move on past that. Your Honor, Judge Elrod, you hit on something during Danos' argument that I want to come back to and that's this concept of well if there's any doubt or if there's any conflict in the factual record as to whether the parties expected that the vessel would play a substantial role at the time of contracting then isn't that a factual dispute. I think we've made this very clear from our briefing what Genesis would like this court to do is to render judgment in Genesis' favor granting Genesis' motion for summary judgment. But the procedural posture on appeal here is an appeal from cross motion from summary judgment at which Genesis was the loser. And so we haven't really talked about this but the facts in the record have to be viewed in the light most favorable to Genesis, right? And if the court finds that there's a factual dispute on something then the answer is we have to reverse it and maybe it gets remanded for trial instead of rendering judgment in our favor which probably isn't our first choice. What's your best, you know, they say platform doesn't work. That it's a working platform. What's your best vehicle to get you there? The declarations of Bourgeois and Douglas. So what specifically about what was done is worth it? There's two points and I'm going to start with Duaron and I'm going to read from the conclusion of Duaron where it says what the analysis is. Do the parties expect that a vessel will play a substantial role in the completion of the contract? The only way for us to answer the question as to what the parties expected is to look at the declarations and the declarations themselves say that the vessel would provide an additional platform for the work. But then they go on to detail exactly how and I'm glad I brought the Douglas declaration with me. They talk about the crew eating their meals on the vessel. They talk about the transport of crew using the personnel baskets. They talk about the job safety analysis and the safety meetings taking place on the vessel. They talk about the vessel housing equipment and cargo and the transport of this cargo back and forth. I'm trying to summarize as opposed to reading this because I'll use all my time reading it. The powering of diesel operated equipment such as the platforms, crane, welding machines and light racks. The equipment was necessary for the completion of Danos' work and could not operate but for the diesel fuel supplied by the vessel. I'm going to stop there because I have another point I want to make in my rebuttal but the direct answer to your question is look at the declarations. That tells you what the parties expected at the time of contracting and this flows very cleanly into the second point that I wanted to make which is what Danos has done in oral argument today is the same thing it did in its briefing and the district court which is to try to direct the attention and the analysis to what Danos claims actually happened on the platform but the question we're answering which is how is this contract classified has to look at the parties expectations at the time of contracting. The only evidence in the record about that is the two declarations and that's where the analysis has to begin and in our view end. There was a lot of discussion about the job plan respectfully the job plan is not part of the contract. When you look at the job plan which you'll be able to look at it's in the record. It's a health and safety document. It's a genesis health and safety document prepared to assess safety and risk. That is not part of the contract between the parties. The contract between the parties is the MSA which doesn't have anything to say about this specific work and the oral work order and the only evidence in the record about the oral work order. I hate to beat a dead horse here. It's the declarations. And then the very last point I want to make is if we're talking about whether the use of the vessel was substantial or not. Genesis obviously thought that the use of the vessel was substantial. You don't have to take my word for it. You don't have to take Brent Douglas' word for it. It's the point that Judge Duncan made a vessel to stay alongside the platform. More than they paid Danos to do the work itself. If you want objective evidence as to the importance of the vessel in performing the work, that's it. Thank you. Thank you very much. We appreciate both the arguments and the case. The case is submitted. This concludes this session of the court for this week. Could you hear us? We were testing out the new sound system. Could you hear us? It all worked well? Yes, sir. It's difficult in the gallery. Okay, that's good feedback. So with that, you have a comment.